# IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

## January 2014 Term

**FILED**

**February 5, 2014**

released at 3:00 p.m.
RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

No. 12-0174

---

**LAWYER DISCIPLINARY BOARD,**
Petitioner


**V.**


**RICHARD T. BUSCH,**
a member of The West Virginia State Bar,
**Respondent**

---

Lawyer Disciplinary Proceeding

**LAW LICENSE SUSPENDED AND OTHER SANCTIONS**

---

Submitted: January 22, 2014
Filed: February 5, 2014

Rachael L. Fletcher Cipoletti, Esq.    J. Michael Benninger, Esq.
Chief Lawyer Disciplinary Counsel    Benninger Law, PLLC
Office of Disciplinary Counsel    Morgantown, West Virginia
Charleston, West Virginia    Attorney for the Respondent
Attorney for the Petitioner


The Opinion of the Court was delivered PER CURIAM.

**SYLLABUS BY THE COURT**

1.  "A *de novo* standard applies to a review of the adjudicatory record made before the [Lawyer Disciplinary Board] as to questions of law, questions of application of the law to the facts, and questions of appropriate sanctions; this Court gives respectful consideration to the [Board's] recommendations while ultimately exercising its own independent judgment.  On the other hand, substantial deference is given to the [Board's] findings of fact, unless such findings are not supported by reliable, probative, and substantial evidence on the whole record."  Syllabus point 3, *Committee on Legal Ethics v. McCorkle*, 192 W. Va. 286, 452 S.E.2d 377 (1994).


2.  "Rule 3.16 of the West Virginia Rules of Lawyer Disciplinary Procedure enumerates factors to be considered in imposing sanctions and provides as follows: 'In imposing a sanction after a finding of lawyer misconduct, unless otherwise provided in these rules, the [West Virginia Supreme Court of Appeals] or [Lawyer Disciplinary Board] shall consider the following factors: (1) whether the lawyer has violated a duty owed to a client, to the public, to the legal system, or to the profession; (2) whether the lawyer acted intentionally, knowingly, or negligently; (3) the amount of the actual or potential injury caused by the lawyer's misconduct; and (4) the existence of any aggravating or mitigating factors.'"  Syllabus point 4, *Office of Lawyer Disciplinary Counsel v. Jordan*, 204 W. Va. 495, 513 S.E.2d 722 (1998).

i

3.	"Mitigating factors in a lawyer disciplinary proceeding are any considerations or factors that may justify a reduction in the degree of discipline to be imposed." Syllabus point 2, *Lawyer Disciplinary Board v. Scott*, 213 W. Va. 209, 579 S.E.2d 550 (2003).

4.	"Mitigating factors which may be considered in determining the appropriate sanction to be imposed against a lawyer for violating the Rules of Professional Conduct include: (1) absence of a prior disciplinary record; (2) absence of a dishonest or selfish motive; (3) personal or emotional problems; (4) timely good faith effort to make restitution or to rectify consequences of misconduct; (5) full and free disclosure to disciplinary board or cooperative attitude toward proceedings; (6) inexperience in the practice of law; (7) character or reputation; (8) physical or mental disability or impairment; (9) delay in disciplinary proceedings; (10) interim rehabilitation; (11) imposition of other penalties or sanctions; (12) remorse; and (13) remoteness of prior offenses." Syllabus point 3, *Lawyer Disciplinary Board v. Scott*, 213 W. Va. 209, 579 S.E.2d 550 (2003).

5.	"Aggravating factors in a lawyer disciplinary proceeding are any considerations or factors that may justify an increase in the degree of discipline to be imposed." Syllabus point 4, *Lawyer Disciplinary Board v. Scott*, 213 W. Va. 209, 579 S.E.2d 550 (2003).

6.        """In deciding on the appropriate disciplinary action for ethical violations, this Court must consider not only what steps would appropriately punish the respondent attorney, but also whether the discipline imposed is adequate to serve as an effective deterrent to other members of the Bar and at the same time restore public confidence in the ethical standards of the legal profession." Syllabus Point 3, *Committee on Legal Ethics v. Walker*, 178 W. Va. 150, 358 S.E.2d 234 (1987).' Syl. Pt. 5, *Committee on Legal Ethics v. Roark*, 181 W. Va. 260, 382 S.E.2d 313 (1989)." Syllabus point 7, *Office of Lawyer Disciplinary Counsel v. Jordan*, 204 W. Va. 495, 513 S.E.2d 722 (1998).

7.        "Ethical violations by a lawyer holding a public office are viewed as more egregious because of the betrayal of the public trust attached to the office." Syllabus point 3, *Committee on Legal Ethics v. Roark*, 181 W. Va. 260, 382 S.E.2d 313 (1989).

**Per Curiam:**

This lawyer disciplinary proceeding against Richard T. Busch (hereinafter "Mr. Busch") was brought to this Court by the Office of Disciplinary Counsel (hereinafter the "ODC") on behalf of the Lawyer Disciplinary Board (hereinafter the "Board"). The Board's Hearing Panel Subcommittee (hereinafter the "Subcommittee") determined that Mr. Busch committed numerous violations of the West Virginia Rules of Professional Conduct and recommended that his law license be suspended for a period of three years, among other sanctions that will be fully set forth in this opinion. Mr. Busch filed an objection to the recommendations,[1] arguing that his conduct was merely negligent, not intentional. Therefore, he suggests a lesser suspension. Based upon the parties' arguments to this Court, the appendix record designated for our consideration, and the pertinent authorities, we adopt the recommendations of the Subcommittee.

## I.

## FACTUAL AND PROCEDURAL HISTORY

Mr. Busch was admitted to practice law by the West Virginia State Bar on April 23, 2002. Initially, Mr. Busch practiced law at his father's firm in Elkins, West Virginia. The conduct in question began in January 2009 during Mr. Busch's tenure as the

---

[1]Under Rule 3.11 of the Rules of Lawyer Disciplinary Procedure, a "lawyer shall have thirty days . . . within which to file . . . [an] objection . . . to the disposition of the formal charge recommended by the Hearing Panel Subcommittee."

Randolph County Prosecuting Attorney and ended with his resignation from the position on December 5, 2011.[2] A background of the alleged misconduct is summarized herein.

### *Count I - Complaint Regarding Conduct in the Blake Case*

J. Ronald Blake, Jr., and his wife, Judy Mae Blake, were the co-directors of the Community Response Foundation (hereinafter the "CRF"), a non-profit organization specializing in representative payee services for Social Security recipients. Mr. Blake died November 29, 2009, and Mrs. Blake continued in the role of the CRF's director. A warrant was issued on December 4, 2009, for the arrest of Mrs. Blake for embezzlement by a fiduciary related to her work as the CRF's director. Subsequently, on December 7, 2009, a warrant was issued for all records and computers pertaining to the Blakes and the CRF.

A hearing was held before the Honorable Judge Jaymie Wilfong on April 7, 2010, pertaining to a request from Appalachian Benefits Assistance, Inc., the court-appointed conservator for the CRF, to receive an archival copy of the records of the seized computers. Judge Wilfong entered an order on April 8, 2010, "that such computers be turned over, FORTHWITH, to the State Police Crime Lab and that a complete archival record for each

---

[2]The Randolph County Commission had ordered an investigation into Mr. Busch's position as Prosecuting Attorney. A meeting was scheduled for December 6, 2011, to discuss the report that resulted from the enquiry. Mr. Busch resigned one day prior to the scheduled meeting.

2

computer be made and forwarded to Appalachian Benefits on an EXPEDITED basis."

During a status conference, thereafter, on July 21, 2010, the contention was made that Mr.

Busch failed to comply with the directive in the April 8, 2010, order. In response, Mr. Busch

made the following statement to the circuit court:

> And, what he [referring to Sergeant Casto of the West Virginia State Police in Morgantown] is doing is he is duplicating the hard drive while keeping it in the chain of custody so we can get that hard drive out and get it to Mr. Jory [counsel for Mrs. Blake] and also to the benefit services group, the Appalachian Benefits, has taken over the accounts.

Additionally, Mr. Busch proffered, "So, at this point, I tried to contact Sergeant Casto

yesterday and I'm awaiting his response with regards to the status of if he's copied the hard

drive or not. Essentially, that's where we are, Your Honor."

On July 22, 2010, a staff person in Mr. Busch's office inquired as to the

location of the computers and was advised that the computer equipment remained in the

evidence locker at the Randolph County Sheriffs Office. Additional communication

occurred between Mr. Busch's staff and Sergeant Casto via e-mail messages on July 21 and

July 22, 2010, concerning the computer hard drives and the duplication of the same.[3]

---

[3]Sergeant Casto produced an affidavit that the communication on July 21, 2010, with Mr. Busch's staff was the first communication he had about the subject evidence. Sergeant Casto stated that, prior to this communication, the subject evidence had not been submitted to the West Virginia State Police Digital Forensics Unit. Sergeant Casto said he became aware of Mr. Busch's assertions during the July 21, 2010, court hearing when a
(continued...)

On July 26, 2010, Mr. Busch submitted a proposed order to Judge Wilfong for the July 21, 2010, hearing. Despite his awareness that the evidence remained in Randolph County and that his prior statements to the court regarding Sergeant Casto had been false, Mr. Busch took no remedial action to correct his prior misstatements to the court and, instead, memorialized the same in a draft order. The following day, in response to receiving the proposed order from Mr. Busch, Mr. Jory requested modifications. Specifically, Mr. Jory stated, "Not being computer literate, I interpret 'duplicate the hard drive' to mean that another hard drive should be produced. Nevertheless, it is the documents on the hard drive which Appalachian Benefits and I seek to obtain." Later, on July 30, 2010, Mr. Busch directed that the computer equipment be transported to the State Police Forensics Lab in Morgantown, West Virginia.

By correspondence dated August 3, 2010, Mr. Busch advised the circuit court:

> The State's investigation may or may not include the said hard drives that are being provided to Appalachian Benefits Services, and therefore the State is of the opinion that the Defendant is not entitled to copies of said hard drives at this time. Please advise how the Court wishes the State to proceed, through correspondence or by order.

---

[3](...continued)
trooper contacted him to advise that Judge Wilfong stated in Court that she was contemplating holding Sergeant Casto in contempt of court for his delays.

By order entered August 24, 2010, the lower court ordered that "all documents in the seized hard drives be printed and that copies thereof be duplicated and provided to Appalachian Benefits Assistance, Inc., and to Defendant on or before August 9, 2010."

On or about August 24, 2010, the original computer equipment was returned to the Randolph County Sheriffs Office. Appalachian Benefits Assistance, in its capacity as conservator for the CRF, received a cloned copy. Despite the prior court orders, however, no archival copy was provided to Mr. Jory, counsel for Mrs. Blake. By letter dated September 9, 2010, Mr. Jory wrote to Mr. Busch and inquired about the documents that were the subject of the two prior court hearings. Mr. Jory requested the same be provided to him within the next week. Thereafter, by letter dated September 23, 2010, Mr. Busch wrote to Mr. Jory and stated "[p]erhaps more curious, however, is why you feel that you are entitled to such information. First, Ms. Blake has not yet been indicted. The potential relevance of these hard drives is, and shall remain undetermined until an indictment is returned." By letter dated September 28, 2010, Mr. Jory responded to Mr. Busch's letter and stated, in pertinent part,

> [l]est you forget, I am entitled to a copy of the hard drives because a court order exists stating that they shall be delivered to me. If you believe the order to be erroneous, you have an obligation to have it changed. Otherwise, you could find yourself in contempt of a court order. The ultimate issue is not, as you suggest, one of relevance.

Judge Wilfong had been copied on both attorneys' correspondence. By letter dated October 12, 2010, Judge Wilfong wrote that Mr. Busch had been directed at the July 21, 2010, hearing to provide Mr. Jory with the subject evidence. Further, Judge Wilfong referenced Mr. Busch's statements made during the July 21, 2010, hearing about the delays in receiving the subject evidence from Sergeant Casto and indicated that she learned that the hard drives were not in Sergeant Casto's possession at the time of the July 21, 2010, hearing. Judge Wilfong further explained that she had been advised that the hard drives were transported to Sergeant Casto on July 30, 2010. The circuit court's correspondence further asserted that Mr. Busch had been made aware of the location of the hard drives on several occasions and, despite the knowledge concerning the location of the hard drives, Mr. Busch never contacted the court to correct his misrepresentations made at the July 21, 2010, hearing. Finally, Judge Wilfong invited the parties to advise her if she had inaccurately assessed that the statements made by Mr. Busch were false and misleading. Mr. Busch did not respond to Judge Wilfong's letter.

The Grand Jury of Randolph County issued an eleven count indictment against Mrs. Blake on October 25, 2010. Mr. Busch advised Mr. Jory in a November 9, 2010, letter that he had

> directed . . . [the] release [of] the original hard drives that were obtained as evidence in the above-referenced case . . . [because] [f]urther investigation has led me to determine that the files contained on the hard drives are neither relevant nor germane to

6

the charge[s] against your client returned by the Randolph County Grand Jury.

However, Mr. Busch later admitted that, despite the contrary representation in the letter, he did not review the contents of the hard drives.

Mrs. Blake was arraigned on November 10, 2010, and trial was set for January 11, 2011. Mr. Jory filed a motion to dismiss the case based upon Mr. Busch's prosecutorial misconduct citing, in relevant part, Mr. Busch's failure to comply with the court's orders and his lies to the court and Mr. Jory about the same. The motions were heard on December 22, 2010. The circuit court found that Mr. Busch "deliberately refus[ed] to turn over documents as required;" made false statements to the circuit court during the July 21, 2010, hearing; attempted to shift the blame to others who were not responsible; failed to correct the false statements made to the court during the July 21, 2010, hearing even after the court gave him an opportunity to correct the same by the issuance of a letter on October 12, 2010; and found that, despite Mr. Busch's assertions to Mr. Jory in his November 9, 2010, letter that the computer records were not germane, Mr. Busch subsequently acknowledged in the December 22, 2010, hearing that he had never reviewed the records.

The circuit court entered a January 10, 2011, order, finding Mr. Busch's conduct to "clearly demonstrate a pervasive pattern of prosecutorial misconduct" and dismissed the case against Mrs. Blake with prejudice. By letter dated January 10, 2011,

7

Judge Wilfong reported to the ODC allegations of misconduct by Mr. Busch in a criminal matter. The ODC initiated an investigation into Judge Wilfong's allegations. By letter dated January 13, 2011, Disciplinary Counsel sent the complaint to Mr. Busch, and his verified response was filed March 2, 2011.

### *Count II - Complaint Regarding Conduct in the Faulkner Case*

Autumn Ray Faulkner was indicted by the Randolph County Grand Jury during the February 2011 term of court on three counts of sexual abuse by a parent, guardian, custodian, or person in position of trust, and three counts of sexual abuse in the third degree. Ms. Faulkner was arraigned on March 9, 2011, and trial was set for June 2011. Ms. Faulkner's counsel of record, Mr. Mazzei, filed a "Motion to Dismiss Indictment or in the Alternative to Suppress Evidence on Additional Grounds." In relevant part, Mr. Mazzei claimed that the Prosecuting Attorney's Office refused to provide him with a video of the minor child victim. When questioned by the circuit court about this issue during a hearing on June 1, 2011, Mr. Busch advised the lower court that he had never been in possession of the video, that he had been in contact with the West Virginia State Trooper assigned to the case on multiple occasions, and that he believed that the West Virginia State Trooper had lost the evidence.

Subsequent to the June 1, 2011, hearing, Judge Wilfong was informed that the statements made by Mr. Busch may not have been accurate, and, out of an abundance of caution, she noticed the same for judicial review. Trooper First Class Loudin was not in attendance at the previous motion hearing, but did attend the judicial review hearing. Trooper First Class Loudin testified that the video in question had never been "lost;" that there was a copy of the same in his investigative file; and that Mr. Busch never contacted him about the video.  Mr. Busch denied that he had blamed Trooper First Class Loudin for losing the video and indicated that he was responsible for the video, not Trooper First Class Loudin. Judge Wilfong then read from the prepared transcript of the June 1st hearing wherein Mr. Busch clearly placed the blame for the missing video on Trooper First Class Loudin and inquired of Mr. Busch what other inference could be drawn from Mr. Busch's statements. Judge Wilfong found that Mr. Busch made a material misrepresentation to the court and held him in contempt of court.  By letter dated June 8, 2011, because the court had exposed his false statements about Trooper Loudin's culpability, Mr. Busch now asserted that the reason the prosecutor's office did not have the subject disc was that the same had been given to Mr. Mazzei; Mr. Busch additionally produced a handwritten receipt to support his new contention.  By letter dated June 10, 2011, Mr. Mazzei disputed that he had received a copy of the video. Mr. Mazzei stated that "he had filed three (3) separate prior discovery requests requesting this information and received no response from Mr. Busch."  Mr. Mazzei

reiterated his position that, based on Mr. Busch's course of misconduct, Ms. Faulkner's case should be dismissed with prejudice.

Prior to holding the sanctions hearing or reporting the same to ODC, Judge Wilfong testified that, on June 13, 2011, she received a text message from Mr. Busch asking to meet with her. Judge Wilfong met with Mr. Busch in her chambers, and she offered to help him and to sit down with Trooper Loudin's supervisor to allow Mr. Busch to explain that he fully understood what he did was wrong in this case. Judge Wilfong stated that, despite how frustrated she was with Mr. Busch's behavior, she felt that she had to offer help because he was a critical member of the bar who had asked for her help. By letter dated June 13, 2011, Mr. Busch advised Trooper Loudin that Judge Wilfong misunderstood him to be blaming Trooper Loudin for losing evidence. By letter dated June 14, 2011, Judge Wilfong, pursuant to her duties as a judge, reported to ODC allegations of misconduct by Mr. Busch in a criminal matter. Judge Wilfong testified that, after reviewing Mr. Busch's letter of June 13, 2011, and by letter dated June 23, 2011, she rescinded her offer to help Mr. Busch. Judge Wilfong testified further that when she read Mr. Busch's correspondence wherein he said that "[m]y statements the judge seized on were incorrect. They were a misstatement of fact and I should have stopped her in her tracks when she took my comments as an attempt to blame you for my not having the disc," she realized that "[s]o now it is not Trooper Loudins' fault, and it's certainly not Rich Busch's fault, it's my fault because I've misunderstood the whole

10

thing . . .".  Judge Wilfong further stated, "I felt at that point that Mr. Busch had no interest in being honest, that he had no interest in correcting it, that it was more of a spin[.]"

On or about June 22, 2011, the ODC sent Mr. Busch a letter directing him to file a response to the complaint within twenty days.  He filed a verified response to the same on or about July 12, 2011.  Further, Mr. Busch resigned his position as Prosecuting Attorney of Randolph County, West Virginia, on December 5, 2011.  Mr. Busch avers that he has not practiced law since that date.

### *Statement of Charges*

The Statement of Charges contains two separate counts: Count I involves Mr. Busch's actions in the Blake criminal case; and Count II relates to Mr. Busch's behavior in the Faulkner criminal case.  In the Blake matter, Mr. Busch was charged with violating the following West Virginia Rules of Professional Conduct: Rule 3.1;[4] Rule 3.3;[5] Rule 3.4;[6] Rule

---

[4]Rule 3.1 of the West Virginia Rules of Professional Conduct directs that
> [a] lawyer shall not bring or defend a proceeding, or assert or controvert an issue therein, unless there is a basis for doing so that is not frivolous, which includes a good faith argument for an extension, modification or reversal of existing law.  A lawyer for the defendant in a criminal proceeding, or the respondent in a proceeding that could result in incarceration, may nevertheless so defend the

(continued...)

11

proceeding as to require that every element of the case be established.

[5]Pursuant to Rule 3.3 of the West Virginia Rules of Professional Conduct,
> (a) A lawyer shall not knowingly:
>> (1) make a false statement of material fact or law to a tribunal;
>> (2) fail to disclose a material fact to a tribunal when disclosure is necessary to avoid assisting a criminal or fraudulent act by the client;
>> (3) fail to disclose to the tribunal legal authority in the controlling jurisdiction known to the lawyer to be directly adverse to the position of the client and not disclosed by opposing counsel; or
>> (4) offer evidence that the lawyer knows to be false. If a lawyer has offered material evidence and comes to know of its falsity, the lawyer shall take reasonable remedial measures.
> (b) The duties stated in paragraph (a) continue to the conclusion of the proceeding, and apply even if compliance requires disclosure of information otherwise protected by Rule 1.6.
> (c) A lawyer may refuse to offer evidence that the lawyer reasonably believes is false.
> (d) In an ex parte proceeding, a lawyer shall inform the tribunal of all material facts known to the lawyer which will enable the tribunal to make an informed decision, whether or not the facts are adverse.

[6]West Virginia Rule of Professional Conduct, Rule 3.4, states that
(continued...)

3.8;[7] and Rules 8.4(c) and (d).[8] It was alleged, in the Faulkner case, that Mr. Busch breached

---

[6](...continued)

A lawyer shall not:

(a) unlawfully obstruct another party's access to evidence or unlawfully alter, destroy or conceal a document or other material having potential evidentiary value. A lawyer shall not counsel or assist another person to do any such act;

(b) falsify evidence, counsel or assist a witness to testify falsely, or offer an inducement to a witness that is prohibited by law;

(c) knowingly disobey an obligation under the rules of a tribunal except for an open refusal based on an assertion that no valid obligation exists;

(d) in pretrial procedure, make a frivolous discovery request or fail to make reasonable diligent effort to comply with a legally proper discovery request by an opposing party;

(e) in trial, allude to any matter that the lawyer does not reasonably believe is relevant or that will not be supported by admissible evidence, assert personal knowledge of facts in issue except when testifying as a witness, or state a personal opinion as to the justness of a cause, the credibility of a witness, the culpability of a civil litigant or the guilt or innocence of an accused; or

(f) request a person other than a client to refrain from voluntarily giving relevant information to another party unless:

(1) the person is a relative or an employee or other agent of a client; and

(2) the lawyer reasonably believes that the person's interests will not be adversely affected by refraining from giving such information.

13

the same Rules of Professional Conduct[9] as he had violated in the Blake case.

---

[7]Behavior of a prosecutor is governed specifically by Rule 3.8 of the West Virginia Rules of Professional Conduct:

> The prosecutor in a criminal case shall:
> (a) refrain from prosecuting a charge that the prosecutor knows is not supported by probable cause;
> (b) make reasonable efforts to assure that the accused has been advised of the right to, and the procedure for obtaining, counsel and has been given reasonable opportunity to obtain counsel;
> (c) not seek to obtain from an unrepresented accused a waiver of important pretrial rights, such as the right to a preliminary hearing;
> (d) make timely disclosures to the defense of all evidence or information known to the prosecutor that tends to negate the guilt of the accused or mitigates the offense, and, in connection with sentencing, disclose to the defense and to the tribunal all unprivileged mitigating information known to the prosecutor, except when the prosecutor is relieved of this responsibility by a protective order of the tribunal; and
> (e) exercise reasonable care to prevent investigators, law enforcement personnel, employees or other persons assisting or associated with the prosecutor in a criminal case from making an extrajudicial statement that the prosecutor would be prohibited from making under Rule 3.6.

[8]The pertinent portions of Rule 8.4 of the West Virginia Rules of Professional Conduct provide as follows: "It is professional misconduct for a lawyer to: . . . . (c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation; (d) engage in conduct that is prejudicial to the administration of justice[.]"

[9]*See* notes 4-8, *supra*.

14

Mr. Busch admits that he violated Rule 3.3, although he states the violation was not intentional or knowing. The Subcommittee did not make any findings of fact or conclusions of law or recommendation as to Rule 3.1; however, it specifically found that Mr. Busch's conduct also violated Rules 3.4, 3.8, and 8.4(c) and (d).

Taking into account both mitigating and aggravating factors, the Subcommittee recommended that Mr. Busch's law license be suspended for three years. Additionally, it recommended that, prior to petitioning for reinstatement, Mr. Busch be evaluated by a licensed mental health provider and follow any protocols set forth; that, prior to petitioning for reinstatement, Mr. Busch be ordered to undergo an additional twelve hours of continuing legal education with a focus in ethics; that Mr. Busch be ordered to pay the costs of these proceedings; that, prior to petitioning for reinstatement, Mr. Busch reimburse these costs to the Lawyer Disciplinary Board; and, if Mr. Busch is successfully reinstated in the future, that he be placed on two years of probation with supervised practice by an active attorney in his geographic area in good standing with the State Bar. Mr. Busch filed his objection to the Subcommittee's findings and recommendations. Thus, this matter comes before this Court for review.

## II.

## STANDARD OF REVIEW

Although the Board makes recommendations to this Court regarding sanctions to be imposed upon an attorney for ethical violations, we have held that "'[t]his Court is the final arbiter of legal ethics problems and must make the ultimate decisions about public reprimands, suspensions or annulments of attorneys' licenses to practice law.' Syllabus point 3, *Committee on Legal Ethics of the West Virginia State Bar v. Blair*, 174 W. Va. 494, 327 S.E.2d 671 (1984)." Syl. pt. 1, *Lawyer Disciplinary Bd. v. Scott*, 213 W. Va. 209, 579 S.E.2d 550 (2003).

Our standard of review has been stated as follows:

> A *de novo* standard applies to a review of the adjudicatory record made before the [Lawyer Disciplinary Board] as to questions of law, questions of application of the law to the facts, and questions of appropriate sanctions; this Court gives respectful consideration to the [Board's] recommendations while ultimately exercising its own independent judgment. On the other hand, substantial deference is given to the [Board's] findings of fact, unless such findings are not supported by reliable, probative, and substantial evidence on the whole record.

Syl. pt. 3, *Committee on Legal Ethics v. McCorkle*, 192 W. Va. 286, 452 S.E.2d 377 (1994). *Accord* Syl. pt. 3, *Lawyer Disciplinary Bd. v. Cunningham*, 195 W. Va. 27, 464 S.E.2d 181 (1995). Mindful of these standards, we proceed to consider the parties' arguments.

16

## DISCUSSION

The ODC urges this Court to accept the sanctions as recommended by the Subcommittee. In so doing, the ODC contends that Mr. Busch violated duties to his client, to the public, to the legal system, and to fellow members of the legal profession. This lawyer disciplinary proceeding and its underlying facts are largely undisputed and submitted by stipulation, including Mr. Busch's agreement that he violated Rule 3.3 in both cases. However, Mr. Busch disagrees with the conclusions reached by the Subcommittee that he acted with an intentional state of mind. Rather, Mr. Busch contends that the violations of Rule 3.3 were due to negligent conduct and, therefore, warrant a lesser punishment. Further, Mr. Busch disputes the conclusions that his conduct violated Rules 3.1,[10] 3.4, 3.8, and 8.4(c) and (d) in both the Blake and the Faulkner cases. Thus, before determining the appropriate punishment, this Court must decide which rules were, in fact, violated as a result of Mr. Busch's admitted conduct.

We review this case with the recognition that the ODC is required "to prove the allegations of the formal charge by clear and convincing evidence." Syl. pt. 1, in part, *Lawyer Disciplinary Bd. v. McGraw*, 194 W. Va. 788, 461 S.E.2d 850 (1995). The record

---

[10]At the outset, we note that the findings by the Subcommittee do not support a determination that Mr. Busch violated Rule 3.1. Therefore, we agree with Mr. Busch in this regard and find that his conduct did not breach Rule 3.1.

17

before us fully supports the Subcommittee's determination and conclusion that Mr. Busch violated Rules 3.3, 3.4, 3.8, and 8.4(c) and (d).

First, all parties stipulated to the fact that Mr. Busch's conduct in both cases violated Rule 3.3. Mr. Busch admits that he made false statements to the circuit court, and his contention that his transgressions of Rule 3.3 were negligent as opposed to intentional is an argument best left to the affixation of appropriate sanctions and, therefore, will be discussed later in this opinion.

The evidence illustrates that Mr. Busch's actions in both the Blake case and the Faulkner case also violated Rule 3.4 of the Rules of Professional Conduct. In Blake, Mr. Busch ignored requests made by Mr. Jory, Mrs. Blake's attorney, for the information contained on the computer hard drives. Significantly, Mr. Busch also knowingly disobeyed the circuit court's order from the July 21, 2010, hearing that required Mr. Busch to provide hard drive copies to Mr. Jory. Moreover, in the Faulkner case, Mr. Busch's misconduct unlawfully obstructed Ms. Faulkner's attorney's access to the recording of the alleged victim's statements. Therefore, the Subcommittee's findings that Mr. Busch violated Rules 3.4(a) and (c) in both cases will not be disturbed.

Next, the subcommittee determined that Mr. Busch violated Rule 3.8 in both cases. Mr. Busch, as the elected Prosecuting Attorney, had a duty to make timely disclosures that "tend to negate" the guilt of the accused or mitigate the offense. In the Blake case, Mr. Busch was aware that the computer hard drives could possess exculpatory evidence, and he was under a court-ordered obligation to tender the same to defense counsel. Also, in the Faulkner case, Mr. Busch failed to provide a prior recorded statement of the alleged victim, despite his obligation to do so. Mr. Busch's refusal to comply with the court orders in the above-listed cases, as well as his failure to comply with these special duties as a prosecuting attorney are violations of Rule 3.8.

Finally, we agree with the Subcommittee's conclusions that Mr. Busch violated Rules 8.4(c) and (d). Not only did Mr. Busch make false representations of fact to the circuit court and opposing counsel, he also made false statements of fact in court documents. The evidence clearly established that Mr. Busch made false statements concerning the whereabouts of computer hard drives in the Blake case, as well as the location of the victim's prior recorded statement in the Faulkner case. Mr. Busch's statements to the circuit court inappropriately placed responsibility for the maintenance of the evidence to others, misrepresented his attempts to communicate with others regarding the evidence in question, and falsely stated that the contents of the evidence were not germane to the issues before the circuit court when he had not viewed the evidence in question. Importantly, when presented

19

with opportunities to correct his stated falsehoods and misrepresentations, Mr. Busch failed to provide the proper information.

In summary, we adopt the Subcommittee's determinations that Mr. Busch's conduct violated Rules 3.3, 3.4, 3.8, and 8.4(c) and (d) in both the Blake case and the Faulkner case. Having established that Mr. Busch's conduct violated the aforementioned rules, we must now determine the appropriate sanction. While we give respectful consideration to the Subcommittee's recommendations, the sanction must ultimately be established and determined by this Court. *See* Syl. pt. 3, *McCorkle*, 192 W. Va. 286, 452 S.E.2d 377.

The Subcommittee recommends, among other sanctions, that Mr. Busch's license to practice law be suspended for a period of three years. Conversely, Mr. Busch states that a three-year suspension is too harsh based on his contention that his conduct was merely negligent, and not intentional or knowing. Our analysis of the appropriate sanctions includes the well-settled principles that

> Rule 3.16 of the West Virginia Rules of Lawyer Disciplinary Procedure enumerates factors to be considered in imposing sanctions and provides as follows: "In imposing a sanction after a finding of lawyer misconduct, unless otherwise provided in these rules, the [West Virginia Supreme Court of Appeals] or [Lawyer Disciplinary Board] shall consider the following factors: (1) whether the lawyer has violated a duty owed to a client, to the public, to the legal system, or to the

20

profession; (2) whether the lawyer acted intentionally, knowingly, or negligently; (3) the amount of the actual or potential injury caused by the lawyer's misconduct; and (4) the existence of any aggravating or mitigating factors."

Syl. pt. 4, *Office of Lawyer Disciplinary Counsel v. Jordan*, 204 W. Va. 495, 513 S.E.2d 722 (1998). We will examine each of these elements individually.

### *(1) Duties Owed to Clients, the Public, the Legal System, or the Profession*

Guidance is found in the recognition that "attorney disciplinary proceedings are primarily designed to protect the public, to reassure it as to the reliability and integrity of attorneys and to safeguard its interest in the administration of justice[.]" *Committee on Legal Ethics v. Keenan*, 192 W. Va. 90, 94, 450 S.E.2d 787, 791 (1994). The public relies on lawyers to protect life, liberty, and property. Lawyers are officers of the court and, as such, must operate within the bounds of the law. A lawyer also is expected to maintain the integrity of the profession. The evidence in this case establishes that Mr. Busch violated duties owed to his client: the State of West Virginia. Mr. Busch's misconduct disregarded his duty to the public, to the people of Randolph County, to the legal system, and to the legal profession.

### *(2) Degree of Intransigence of Conduct*

Second, we review Mr. Busch's actions to ascertain whether they were intentional, knowing, or negligent in nature. The degree of the misconduct determines the

21

severity of discipline to be imposed. Mr. Busch asserts that his actions were merely negligent. The evidence, however, shows otherwise.

As we have established previously, Mr. Busch lied and made false statements to opposing counsel and the tribunal. He failed to comply with court orders, and he placed responsibility for his misdeeds on others. Mr. Busch contends that he was inexperienced in the area of criminal law and that his indiscretions were merely negligent. However, the record shows that Mr. Busch was provided with many opportunities to correct the misstatements and inaccuracies that he portrayed to the lower court. When those opportunities arose, he did not take advantage of them. His pattern of misconduct only deepened the misrepresentations made to the court.

If Mr. Busch's actions were truly negligent and not intentional, he had numerous opportunities to make amends. He made a conscious choice, however, to maintain his misrepresentations to the lower court. Significantly, even if Mr. Busch truly believed he was being truthful during his prosecution of both the Blake and the Faulkner cases, upon learning that he had misstated the evidence and provided inaccuracies to the court, Mr. Busch could have taken reasonable steps to correct the same. He failed to do so. We agree with the Subcommittee's summation that Mr. Busch's actions were intentional.

### (3) Amount of Real or Potential Injury

Third, we examine the amount of real injury or potential injury in this matter. Mr. Busch was the chief law enforcement officer of Randolph County, and he repeatedly lied to the circuit court judge about the actions of law enforcement officers in the community. This pattern of misconduct not only caused actual harm to the legal system by undermining the community's perception of the justice system, but also endangered the jobs, pension plans, and credibility of the law enforcement officers who were portrayed as irresponsible by Mr. Busch. Further, Mr. Busch's misconduct could have affected the freedom of the defendants involved, especially when possibly exonerating evidence was not provided to them. As a matter of public harm, the dismissal of criminal cases merely because of prosecutorial misconduct is a waste of public funds, as well as a detractor from the public confidence in the office of the prosecutor. The amount of real or potential harm in this case was significant.

### (4) Presence of Mitigating and Aggravating Factors

The fourth and final factor in our analysis is the presence of mitigating and aggravating factors. "Mitigating factors in a lawyer disciplinary proceeding are any considerations or factors that may justify a reduction in the degree of discipline to be imposed." Syl. pt. 2, *Lawyer Disciplinary Bd. v. Scott*, 213 W. Va. 209, 579 S.E.2d 550 (2003). The *Scott* opinion, at Syllabus point 3, further explains that

> [m]itigating factors which may be considered in determining the appropriate sanction to be imposed against a lawyer for violating the Rules of Professional Conduct include: (1) absence of a prior disciplinary record; (2) absence of a dishonest or selfish motive; (3) personal or emotional problems; (4) timely good faith effort to make restitution or to rectify consequences of misconduct; (5) full and free disclosure to disciplinary board or cooperative attitude toward proceedings; (6) inexperience in the practice of law; (7) character or reputation; (8) physical or mental disability or impairment; (9) delay in disciplinary proceedings; (10) interim rehabilitation; (11) imposition of other penalties or sanctions; (12) remorse; and (13) remoteness of prior offenses.

213 W. Va. 209, 579 S.E.2d 550.

Based on the evidence before the Subcommittee, the following mitigating factors were recognized: (1) upon the advice of counsel, prior to the commencement of impeachment proceedings, Mr. Busch voluntarily resigned his position as prosecuting attorney; (2) there was no prior disciplinary record; and (3) by and through counsel, Mr. Busch displayed a cooperative attitude toward the disciplinary proceeding. Moreover, Mr. Busch argues to this Court that additional mitigating factors existed. Specifically, he delineates the following mitigating factors: his lack of any prior service as prosecuting attorney and experience in handling criminal cases generally; his attempt to ask the circuit court for guidance in both cases; the absence of any dishonest or selfish motive; the personal and emotional problems created for him as a result of his father's long-term illness and the loss of his father as a mentor and resource person; his general anxiety disorder for which he

24

has been treated for a number of years; his general good character; and the delay of over one year in these lawyer disciplinary proceedings from his final evidentiary hearing on July 27, 2012, until the issuance of the Subcommittee's report in August 2013.

By contrast, "[a]ggravating factors in a lawyer disciplinary proceeding are any considerations or factors that may justify an increase in the degree of discipline to be imposed." Syl. pt. 4, *Scott*, *id*. The Subcommittee found the following aggravating factors in this case: (1) pattern of misconduct; (2) multiple offenses; (3) refusal to acknowledge wrongful nature of the conduct; (4) experience in the practice of law; (5) aside from the execution of Judge Wilfong's mandatory judicial duty to report to ODC, there was no additional penalty imposed upon Mr. Busch by the Judge in either the Blake or Faulkner cases for his misconduct; (6) lack of any interim rehabilitation in the execution of his duties as the prosecuting attorney after the Blake case; and (7) the fact that Mr. Busch was the elected prosecuting attorney, in a position of public trust, at the time of the misconduct.

In fashioning the sanction, this Court is mindful of its prior holding that,

> "'[i]n deciding on the appropriate disciplinary action for ethical violations, this Court must consider not only what steps would appropriately punish the respondent attorney, but also whether the discipline imposed is adequate to serve as an effective deterrent to other members of the Bar and at the same time restore public confidence in the ethical standards of the legal profession.' Syllabus Point 3, *Committee on Legal Ethics v. Walker*, 178 W. Va. 150, 358 S.E.2d 234 (1987)." Syl. Pt. 5,

25

> *Committee on Legal Ethics v. Roark*, 181 W. Va. 260, 382 S.E.2d 313 (1989).

Syl. pt. 7, *Jordan*, 204 W. Va. 495, 513 S.E.2d 722. Unfortunately, this Court has had previous occasion to consider disciplinary measures for attorneys in public office. In those reviews, we placed great emphasis on the importance of the community's trust in the matter of public office. For example, in this Court's *Scott* opinion, we stated that "[i]n addition to the aggravating factors suggested by the ODC, this Court finds . . . other circumstances that are aggravating factors in this case: the fact that Mr. Scott violated the Rules of Professional Conduct while he held a public office[.]" *Scott*, 213 W. Va. at 216, 579 S.E.2d at 557. While recognizing multiple mitigating factors in *Scott*, we also were gravely concerned by the pattern of misconduct exhibited by Mr. Scott during his term as Prosecuting Attorney of Harrison County. In addition to other sanctions, this Court imposed a three-year suspension of Mr. Scott's law license. *See also Committee on Legal Ethics of the West Virginia State Bar v. White*, 189 W. Va. 135, 428 S.E.2d 556 (1993) (lawyer was prosecuting attorney who pled guilty to possession of cocaine and had his law license suspended for two years); *Committee on Legal Ethics of the West Virginia State Bar v. Boettner*, 188 W. Va. 1, 422 S.E.2d 478 (1992) (lawyer was state senator who pled guilty to evading payment of federal income taxes and had his law license suspended for three years); *Committee On Legal Ethics of West Virginia State Bar v. Roark*, 181 W. Va. 260, 382 S.E.2d 313 (1989) (lawyer was prosecuting attorney and former mayor who pled guilty to possession of cocaine and had his law license suspended for three years).

Balancing the mitigating and aggravating factors in the instant case, we are convinced that the recommendations by the Subcommittee, including a three-year license suspension, are appropriate. There is simply no justification for permitting Mr. Busch's ability to practice law to go unimpeded after he engaged in such egregious conduct as a public official. As we have held previously, "[e]thical violations by a lawyer holding a public office are viewed as more egregious because of the betrayal of the public trust attached to the office." Syl. pt. 3, *Roark*, 181 W. Va. 260, 382 S.E.2d 313. We find that Mr. Busch's pattern of misconduct, coupled with his habit of continuing his dishonest behavior even when provided opportunities to remedy the same, was a detriment to the public office, to the State of West Virginia as his client, to the public who deserved efficiency and protection from the public office, to the legal system, and to the legal profession. For those reasons, we adopt the recommendations as set forth by the Subcommittee.[11]

---

[11]In his assertion that his conduct did not warrant a license suspension, Mr. Busch also set forth that he deserves credit toward any sanctions approved by this Court. In that regard, Mr. Busch resigned as prosecuting attorney on December 5, 2011, and states he has not practiced law since that date. Thus, Mr. Busch asserts that any suspension should be retroactive to that date. We find this argument wholly without merit.

Factually, the County Commission had ordered an investigative report into the workings of Mr. Busch's office, and they were scheduled to meet to discuss the same on December 6, 2011. Mr. Busch resigned one day prior to the Commission's scheduled meeting to discuss the investigation into his conduct in office. Mr. Busch's resignation prior to the meeting was not an act of remorse. Rather, we view it as an attempt to avoid reprimand and to keep his digressions out of the public spotlight. Further, his claim that he has not practiced law since that date merits no consideration. He did not give up his law license, only his prosecuting attorney title.

## IV.

## CONCLUSION

For the foregoing reasons, we adopt the following sanctions as recommended by the Hearing Panel Subcommittee that: Mr. Busch's law license be suspended for three years; prior to petitioning for reinstatement, Mr. Busch be evaluated by a licensed mental health provider and follow any protocols set forth; prior to petitioning for reinstatement, Mr. Busch be ordered to undergo an additional twelve hours of continuing legal education with a focus in ethics; Mr. Busch be ordered to pay the costs of these proceedings; prior to petitioning for reinstatement, Mr. Busch reimburse these costs to the Lawyer Disciplinary Board; and, if Mr. Busch is successfully reinstated in the future, he be placed on two years of probation with supervised practice by an active attorney in his geographic area in good standing with the State Bar.

Law License Suspended and Other Sanctions.